1
2
3
4
5          **UNITED STATES DISTRICT COURT**
6          **EASTERN DISTRICT OF CALIFORNIA**
7
8  **GEORGE HERNANDEZ, JR.; JOE A.**      )     **1:04-cv-5515 OWW DLB**
   **HERNANDEZ; MANUEL A. HERNANDEZ;**   )
   **and ARMANDO PULIDO,**                )     **MEMORANDUM DECISION AND**
9                                         )     **ORDER RE APPROVAL OF CLASS**
            **Plaintiffs,**               )     **SETTLEMENT AGREEMENT AND**
10                                        )     **APPROVAL OF NOTICE.**
      **v.**                              )
11                                        )
   **KOVACEVICH "5" FARMS; KENNETH**      )
12 **KOVACEVICH, JR.; MARK J.**           )
   **KOVACEVICH; CAROL K. YINGST;**       )
13 **MARSHA RITCHIE; ANN K.**             )
   **TARTAGLIA; and KENNETH**             )
14 **KOVACEVICH, SR.,**                   )
                                          )
15          **Defendants.**               )
   _____    )
16
17
18              **I.   INTRODUCTION**
19
        This matter is before the court on Plaintiffs' unopposed
20
   motion for final approval of the Parties' class action settlement
21
   agreement ("Settlement Agreement"), which includes a negotiated
22
   attorney's fee award.  The proposed Settlement Agreement would
23
   resolve a dispute between the Plaintiff Class of seasonal
24
   agricultural workers and Defendants Kovacevich "5" Farms, its
25
   individual partners, and Kenneth Kovacevich, Sr. ("Kovacevich,
26
   Sr.") (collectively, "Defendants" or "K5 Farms").  Plaintiff
27
   Class alleged that Defendants required Class members to perform
28
   unpaid, "off-the-clock" work in violation of federal and state
   worker protection laws.  (Doc. 162 at 2:27.)

                              1

## II.  **FACTUAL BACKGROUND**

### A.  **Background Union Activity at K5 Farms.**

This lawsuit arises in the context of an ongoing effort by the United Farm Workers of America, AFL-CIO ("UFW") to organize the employees of K5 Farms.  (Doc. 37 at 2:2-3.)  This effort led to a secret ballot election supervised by the California Agricultural Labor Relations Board, held on August 19, 2003. (*Id.* at 2:3-5.)  The employees voted 160-95 against UFW representation.  (*Id.* at 2:6-7.)  All of the Named Plaintiffs in this lawsuit, while not union members, are members of the UFW's "Organizing Committee," a group actively engaged in promoting union representation on behalf of the UFW.  (*Id.* at 2:11-14.) Moreover, Thomas P. Lynch, who is one of Plaintiffs' counsel, works for the law firm headed by Marcos Camacho.  Marcos Camacho himself, according to an exhibit attached to Defendants' Opposition, serves as General Counsel to the UFW.  (*Id.* at Ex. 5.)


### B.  **Facts under which this Case Arises.**

Representative Plaintiffs George Hernandez, Jr., Manual A. Hernandez, Joe. A. Hernandez, and Armando Pulido (collectively, "Named Plaintiffs") brought this class action under the Migrant and Seasonal Agricultural Worker Protection Act ("AWPA"), 29 U.S.C. § 1801 *et seq.* and California state law, on behalf of themselves and all similarly-situated field laborers to recover unpaid wages, accrued interest and penalties, attorneys' fees and costs, and injunctive relief from Defendants.  (Doc. 162 at 2:21-26.)  Defendants are engaged jointly in the business of growing

2

table grapes and other agricultural commodities, including

persimmons, on land located primarily in Tulare County,

California.  (Doc. 88 at 2:16-19.)  The Named Plaintiffs are

seasonal farm workers who have worked in Defendants' table grape

fields.  (*Id.* at 2:19-20.)  One of the Named Plaintiffs, Armando

Pulido, along with a Subclass, has also harvested other crops for

Defendants.  (*Id.* at 2:20-21.) On behalf of themselves and the

Class, Plaintiffs complained that Defendants required Class

members to perform unpaid, off-the-clock preparation work before

the start of their official work shifts each morning during the

harvest, in violation of federal and state wage and hour laws.

(*Id.* at 2:21-23.)  Plaintiffs also complained that Defendants

violated other state law by failing to keep accurate records of

all hours worked, failing to post required signs, and failing to

provide Class members with all necessary tools and equipment.

(*Id.* at 2:23-26.)

### III.  **PROCEDURAL HISTORY**

Three of the four Named Plaintiffs, and another plaintiff

whose subsequent withdrawal as a Class representative was

approved by the Court, filed the original complaint on April 2,

2004 on behalf of themselves and a proposed Class of more than

500 similarly situated field laborers.  On August 13, 2004,

Plaintiffs moved for a protective order regarding Defendants'

communications with putative Class members.  (Doc. 20.)  This

motion was denied on September 10, 2004.  (Doc. 29.)  Plaintiffs

amended their complaint on September 30, 2004 to add Plaintiff

Pulido as a Class representative and to add a Subclass, of which

**3**

1  Plaintiff Pulido is a member.  (Doc. 35.)  The allegations of the

2  Subclass encompass unpaid work performed by K5 Farm workers who

3  also harvested persimmons and other crops for Defendant

4  Kovacevich, Sr.  (*Id.* at ¶ 24.)[1]

5      Plaintiffs also moved for Class certification on September

6  30, 2004.  (Doc. 31.)  On December 2, 2004, the Court certified a

7  Class of "all persons who worked at K5 Farms as agricultural

8  field laborers and who were not paid for time worked at the

9  beginning of the day."  (Doc. 44 at 3:15-17.)  The Court held

10  that the Class includes persons who are owed "wages that first

11  became due on April 2, 2001 and continuing up to the date that

12  damages are awarded."  (*Id.* at 3:17-19.)

13      On February 16, 2005, representative Plaintiff Jesus

14  Gutierrez moved to withdraw as a Class representative.  (Doc.

15  55.)  The motion was granted on March 15, 2005.  (Doc. 68.)

16  Plaintiffs again amended their complaint on April 7, 2005 to

17  clarify certain claims.  (Doc. 88.)  On March 11, 2005, Class

18  counsel mailed the first court-approved Class Notice to 541

19  persons.  (Doc. 162 at 4:4-6.)  The Notice informed potential

20  Class members of the lawsuit and provided them an opportunity to

21  exclude themselves by completing a Class Exclusion Form enclosed

22  ───────────────

23      [1]  Defendant Kovacevich Sr. controls and owns, as a sole
proprietor, an agricultural business that includes the
24  cultivation and harvest of persimmons, pomegranates, and other
crops.  He has also been, during the relevant period, actively
25  involved in the management and operation of K5 Farms and has
exercised control over the terms and conditions of employment of
26  Class members.  It does not appear from the Settlement Agreement
that work performed on Kovacevich, Sr.'s individual agricultural
27  operations are implicated in this action.  Rather, Kovacevich
Sr.'s role in the operations only of K5 farms is implicated.
28

**4**

with the Notice and filing it with the Court on or before May 10, 2005.  (*Id.* at 4:6-8.)  By May 20, 2005, approximately 50 of the 541 recipients had filed the court-approved Class Exclusion Form. (*Id.* at 4:9-11.)  An additional 25 signatures of persons who did not sign individual Exclusion Forms appeared on a petition-style exclusion document also filed with the Court.  (*Id.* at 4:12-14.)

On April 1, 2005, Plaintiffs filed a motion for a temporary restraining order for alleged "interference by [D]efendants' agents with the right of [C]lass members to participate in this [action]."  (Doc. 74 at 1:22-25.)  The Parties later stipulated to a temporary restraining order and the motion was taken off calendar.  (*See* Doc. 87.)

On April 15, 2005, the Parties filed cross-motions for partial summary judgment and responded to these motions on April 29 (Defendants) and May 2 (Plaintiffs), 2005.  (Doc. 162 at 4:15-17.)  On May 4, 2005, while the cross-motions for summary judgment were still pending, the Parties reached a compromise on the terms of the Settlement Agreement and, by stipulation, the Parties withdrew their summary judgment motions.  The parties moved for preliminary approval of the settlement, and oral argument was held on July 11, 2005.  On July 14, 2005, the district court granted preliminary approval of the settlement and approved the method and form of class notice.  (Doc. 169.)  The order granting preliminary approval provided that any objections to the settlement must be made in writing on or before September 19, 2005.  A fairness hearing was set for September 26, 2005. (*Id.* at 23.)

The court-approved Notice of Proposed Settlement was mailed

to all potential Class members.  (Doc. 171.)  Class Counsel also published a shortened notice in a local Spanish-language newspaper circulated in the area where most of the class members reside.  In addition, reminder post-cards were sent out to the Class, highlighting the deadlines for filing objections.  *See* (Doc. 173.)  As of the September 19, 2005 deadline for objections, none had been filed.

## IV.   STANDARD OF REVIEW

Fed. R. Civ. P. 23(e) requires court approval for all class action settlements.  A court may approve a settlement only after a hearing and on finding that it is fair, reasonable, and adequate.  Fed. R. Civ. P. 23(e)(1)(C).  The court must also ensure that "the best notice practicable under the circumstances" be provided to class members.  Fed. R. Civ. P. 23(c)(2)(B).  In addition, where the payment of attorneys fees is also part of the negotiated settlement, the fee settlement must be evaluated for fairness in the context of the overall settlement.  *See Robbins v. Alibrandi*, 127 Cal. App. 4th 438, 444 (2005).

//
//
//
//
//
//
//
//

1

## V.   <u>LEGAL ANALYSIS</u>

2

3       **A.    Terms of Proposed Settlement Agreement.**

4              **1.    Class Settlement Fund.**

5       Defendants will make two separate installment payments into

6  a settlement fund ("Settlement Fund"), totaling $1.7 million,[2]

7  which will be processed and distributed by Miner, Barnhill &

8  Galland, P.C. ("MBG").  (Doc. 162, Settlement at 5:9-13.)   No

9  portion of the Settlement Fund will revert to any of the

10 Defendants under any circumstances.  (*Id.* at 5:14-15.)

11      The Notice of Class Action Settlement mailed to all non-

12 exempt Class members included a Claim Form.  (*Id.* at 5:23-25.)

13 The Claim Form explains that the deadline for submitting claims

14 is 75 days from the date the Forms are mailed.  (*Id.* at 5:26-27.)

15      Class members who timely submit their claims will be

16 considered "Claiming Class Members."  (*Id.* at 5:27-28.)  Class

17 counsel will make two distribution payments to Claiming Class

18 Members promptly upon receipt of each of Defendants' two

19 installment payments into the Settlement fund.  (*Id.* at 6:26-

20 7:4.)

21      Any money remaining in the Settlement Fund six months after

22 the second distribution, whether resulting from the accrual of

23 interest on the Fund or settlement checks not cleared within six

24 months from issuance, will be used first to pay late claims.

25 (*Id.* at 7:5-8.)  Late claims will be paid only after the second

26

27      **2**  (a)$850,000.00 on November 30, 2005 ("first
installment"); (b)$850,000.00 on November 30, 2006 ("second
28 installment")

**7**

distribution and only if residual money exists in the Fund at that time. (*Id.* at 7:8-10.)  If money remains in the Fund after full satisfaction of all late claims, it will be applied to defray costs incurred by Class counsel in locating Class members and/or distributing payments to Class members who reside outside the United States at the time of distribution. (*Id.* at 7:11-14.) If any money still remains, Class counsel will distribute it *pro rata* among Claiming Class Members, except that if such money is insufficient to provide a "meaningful"[3] *pro rata* distribution, it will be tendered to the California Labor Commissioner for deposit in the state Unpaid Wage Fund. (*Id.* at 7:15-19.)

## 2.  Injunctive Relief.

Defendants agree that neither they nor any of their agents will retaliate in any manner against any person involved in the prosecution of this action. (*Id.* at 7:20-28.)  Defendants will ensure that their record-keeping practices are consistent with Wage Order No. 14 and the California Labor Code. (*Id.* at 8:1-5.) Defendants will also continue to provide pruning shears and clippers to all of their field laborer employees at or before the start of any agricultural season, and will make available, at no charge, protective work gloves for use during pruning season. (*Id.* at 8:6-15.)

---

[3]  During oral argument on the instant motion, Class Counsel explained that they will make a distribution if enough funds remain send out a payment to individual Class Members exceeding $10.00, taking into account the expense of printing and mailing checks, which will be approximately $1,000.00 for the entire Class.  Otherwise, the remaining funds will be tendered to the California Labor Commission.

### 3.  Relief for the Named Plaintiffs.

In consideration for their commitment of effort and time, Defendants agree to a bonus of $1,000 to each of the four Named Plaintiffs: George Hernandez, Jr., Joe A. Hernandez, Manuel A. Hernandez, and Armando Pulido. (*Id.* at 8:18-25.)  The four Named Plaintiffs will also be assured continuous seasonal employment, consistent with their past work history, for a period of two years. (*Id.* at 9:3-4.)  Defendants also agree to resolve allegations of demotion and retaliation, raised by family members and close associates of Named Plaintiffs, by restoring their work positions to the positions held prior to this suit. (*Id.* at 9:7-21.)

### 4.  Attorneys' Fees and Costs.

Defendants will pay Plaintiffs' attorneys' fees and costs in three equal installments, totaling $795,000.00. (*Id.* at 9:23-27.)[4]  Also, Defendants will pay Class counsel up to $25,000.00 for additional attorneys' fees and costs actually incurred in the administration of the Settlement and distribution of payments to Claiming Class Members after final approval of the Settlement. (*Id.* at 10:1-4.)

//
//
//
//

---

[4]  The three equal installments of $265,000.00 are due on May 1, 2006, May 1, 2007, and November 30, 2007.

**5.  Defendants' Assurance That They Will Meet Their Obligations Without Job Loss To Class Members.**

Defendants have stipulated that they will meet the foregoing financial and other obligations of this Settlement without taking measures which would result in the reduction of their field laborer work force.  (*Id.* at 10:9-15.)  In the event that, due to unforeseeable events or conditions beyond Defendants' control, the only way for Defendants to meet their financial obligation to timely make the second installment payment and also remain in operation is either to sell real property on which Class members are working or to reduce their field laborer work force, Defendants will consult with Class counsel about delaying such payment. (*Id.* at 10:15-18.)  Absent agreement between the Parties in such event, no significant reduction[5] in Defendants' field laborer work force may occur without advance approval of the Court.  (*Id.* at 10:19-22.)

**6.  Effective Date.**

If the Court approves of substantially all the terms described in the Settlement Agreement, the Settlement is to become effective thirty-five (35) days after the Court grants a final judgment order--provided that no notice of appeal is filed. (*Id.* at 10:25-28.)  If a notice of appeal is filed, the Settlement is to become effective ten days after all appellate proceedings pertaining to the action have been completed and settlement of the action is final and binding.  (*Id.* at 11:1-5.)

---

[5] "Significant reduction" in work force accords with the standards set forth in the WARN Act, 29 U.S.C. § 2101 *et. seq.*, and Cal. Lab. Code § 1400 *et. seq.*

7.   **Mutual Releases.**

Plaintiffs release Defendants from liability for all claims asserted in this action, any allegations of retaliation that have arisen in connection therewith, and any other claims arising from the set of facts alleged in this action.  (*Id.* at 11:8-17.) Defendants likewise discharge Plaintiffs from all claims that arise from the claims and defenses alleged in this action.  (*Id.* at 11:18-22.)

B.   **Analysis of the Merits of the Settlement Agreement.**

"The court must approve any settlement...of the claims...of a certified class."  Fed. R. Civ. P. 23(e)(1)(A).  The court may approve a settlement only after a hearing and on finding that it is fair, reasonable, and adequate.  Fed. R. Civ. P. 23(e)(1)(C). Such approval is required to make sure that any settlement reached is consistent with plaintiffs' fiduciary obligations to the class.  *Ficalora v. Lockheed Cal. Co.*, 751 F.2d 995, 996 (9th Cir. 1985).  The court also serves as guardian for the absent class members who will be bound by the settlement, and therefore must independently determine the fairness of any settlement.  *Id.* However, the district court's role in intruding upon what is otherwise a private consensual agreement is limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or collusion between the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable, and adequate to all concerned.  *Officers for Justice v. Civil Serv. Comm'n of San Francisco*, 688 F.2d 615, 625 (9th

**11**

1 Cir. 1982).  Therefore, the settlement hearing is not to be

2 turned into a trial or rehearsal for trial on the merits.  *Id.*[6]

3 Ultimately, the district court's determination is nothing more

4 than an amalgam of delicate balancing, gross approximations, and

5 rough justice.  *Id.*

6      In determining whether a settlement agreement is fair,

7 adequate, and reasonable to all concerned, a district court may

8 consider some or all of the following factors: (a) the risk,

9 expense, complexity, and likely duration of further litigation;

10 (b) the amount offered in settlement; (c) the solvency of the

11 defendants; (d) the extent of discovery completed, and the stage

12 of the proceedings; (e) the views and experience of counsel; and

13 (f) any opposition by class members.  *See Molski v. Gleich*, 318

14 F.3d 937, 953 (9th Cir. 2003); *see also In re Montgomery County*

15 *Real Estate Antitrust Litig.*, 83 F.R.D 305, 316 (D.C. Md. 1979).

16 This list of factors is not exclusive and the court may balance

17 and weigh different factors depending on the circumstances of

18 each case.  *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1376

19 (9th Cir. 1993).  This necessarily requires the court to make a

20 careful analysis of all the facts and applicable law.  *Montgomery*

21 *County Real Estate*, 83 F.R.D at 316.

22 //

23 //

24

---

25     [6] It is not the role of the district court to reach any
26 ultimate conclusions on the contested issues of fact and law
which underlie the merits of the dispute.  *Officers for Justice*,
27 688 F.2d at 625.  It is the uncertainty of the outcome in
litigation and avoidance of wasteful and expensive litigation
28 that induce consensual settlements.  *Id.*

### 1.   Expense, Complexity, and Likely Duration of Further Litigation.

The trial of this action has the potential of being complex, expensive, and protracted because it involves a large Class with many causes of action and a high amount in controversy.  Trial of this action will also require significant evidentiary foundation, requiring large expenditures by counsel for both Parties.  The additional expense of further litigation may also diminish the likelihood of full or adequate recovery to members of the Class, whose interests are of paramount concern to the Court.  In contrast, while the Settlement Agreement sets forth a high award, Defendants' financial position has been taken into consideration by both Parties in negotiation, and they believe that the current Settlement Agreement can be met.[7]

### 2.   Amount Offered in Settlement.

The Settlement Agreement sets the monetary award to Class members at $1,700,000.00.  (Doc. 161 at 5:4-5.)  Class counsel asserts that this figure provides Class damages equal to 100 percent of the Class members' unpaid wages plus penalties of four times the unpaid wages.  (*Id.* at 5:5-6.)  Class Counsel present the Declaration of Whitman T. Soule, Doc. 181, an analyst "specializing in the discovery and analysis of computer readable data in class-action litigation."  (*Id.* at ¶1.)  Mr. Soule, utilizing computerized earnings records produced in discovery by

---

[7]   Defendants provided financial information, subject to a stipulated protective order, which was used in determining an adequate and reasonable award for Plaintiffs.  (*See* Doc. 86, Protective Order for Financial Info..)

defendants, computed a damages figure for each class member in the amount of one-half hour pay at the prevailing rate of pay for each day worked during the 2000-2003 harvest periods. (*Id.* at ¶¶3-8; *id.* at Attachment A.)   Attachment B to Mr. Soule's declaration summarizes the damages calculation for each class member.  With interest, the total <u>actual</u> damages figure as calculated by Mr. Soule is $321,440.96.  The total settlement fund of $1,700,000 is more than five times the actual damages figure.  This is a significant victory for the Class.

### 3.   Solvency of the Defendants.

Class counsel asserts that it was able to maximize the award for the Class, while at the same time safeguarding Class members from any negative effect an excessive recovery might have had on the viability of Defendants' business, or on their continued employment by Defendants. (*Id.* at 5:6-11.)  After careful analysis of Defendants' financial records, the Parties agreed to an amount of money and a payment plan that will allow Defendants to maintain solvency and sustain their current level of business operations. (*See* Doc. 162 at 12-13.)

### 4.   The Extent of Discovery Completed, and the Stage of Proceedings.

This case has been aggressively litigated, generating an extensive record and resulting in several pre-trial motions and orders.  From December 2004 through March 2005, the Parties engaged in intensive merits discovery, including Plaintiffs' procurement of nearly 60 declarations and eleven depositions

14

taken of Defendants' principals, their foremen, and the Named Plaintiffs.  (Doc. 162  at 4:1-3.)   Both Parties have filed numerous motions, including motions for a protective order and temporary restraining order by Plaintiffs, two amended complaints submitted by Plaintiffs, and motions for summary judgment submitted by both Parties.  The Settlement proposal was not hastily arrived at.  It came after several months of negotiations and a failed settlement attempt in February 2005.  After conducting extensive discovery, the strengths and weaknesses of each parties' case and their respective exposures to risk at trial were revealed, leading to the proposed Settlement Agreement now before the Court.  (Doc. 161 at 4:22-5:2.)

### 5.    The Views and Experience of Counsel.

Plaintiffs' attorneys recommend the Settlement Agreement as a significant victory for the Class and highly favorable resolution of Class claims.  (*Id.* at 5:4-5.)  They believe that the Settlement Agreement is "fair and reasonable and that it is in the best interests of the [C]lass."  (Doc. 162, 4.)   The curricula vitae submitted by Class Counsel demonstrate their considerable experience with complex class action litigation in the field of employee benefits.[8]  *See* Siskind Decl. Ex. 1; Willenson Decl. at ¶26-28.

### 6.    Opposition by Class Members.

---

[8]  Miner, Barnhill & Galland represented farm laborers in a class action suit brought before this court in November, 2001. (*See Quevedo v. Dole*, 1:01-cv-6443, Doc. 1.)

**15**

1    The response of the class to the settlement plan is

2 particularly helpful in cases in which the court believes that

3 the settlement is widely understood and intelligently considered

4 by the class.  Here, the Class has been properly notified.  No

5 class member has objected to the terms of the settlement, nor has

6 any third party.

7

8        **C.    Was the Notice of Settlement Provided Fair?**

9        Adequate notice is critical to court approval of a class

10 settlement under Fed. R. Civ. P. 23(e).  *Hanlon v. Chrysler*

11 *Corp.*, 150 F.3d 1011, 1025 (9th Cir. 1998).  "The best notice

12 practicable under the circumstances" must be provided to class

13 members.  Fed. R. Civ. P. 23(c)(2)(B).  Notice is satisfactory in

14 the context of settlement if it fairly apprises class members of

15 the terms of the settlement in sufficient detail to afford them

16 the opportunity to decide whether they should accept the benefits

17 offered, opt out and pursue their own remedies, or object to the

18 settlement.  *Churchill Village, L.L.C. v. General Elec.*, 361 F.3d

19 566, 575 (9th Cir. 2004); *see also Hanlon*, 150 F.3d at 1025.

20        The district court approved the form of notice in this case

21 during the preliminary approval process.  *See* Doc. 169 at 20-22.

22 The Notice presented meets the requisite standards of clarity and

23 conciseness as required by Fed. R. Civ. P. 23.  It explains the

24 nature of the action, the definition of the Class, a brief

25 summary of the Class claims, and that a Class member may enter an

26 appearance through counsel if the member so desires.  (*See* Doc.

27 162 at Ex. A-1.)   The Notice provides Class members with the

28 opportunity to opt-out of the Settlement Agreement, giving

specific instructions of when and how they may do so.  (*See id.* at Ex. A-1, 4.)   In addition, the Notice explains the binding effect of the Settlement Agreement on Class members, stating that they "will be bound by it, and [] will not be able to bring a separate lawsuit alleging the same or similar claims." (*See id.* at Ex. A-1, 2.)

The method by which Class counsel notified Class members was also sufficient.  Notice was sent to the Class by first-class mail, a form of notice that is generally considered adequate. *See Varacallo v. Mass. Mutual Life Ins. Co.*, 226 F.R.D. 207, 225 (D.N.J. 2005).  In this case, Class Counsel suggests that notice by mail will be particularly effective.  (*See* Doc. 170 at 2.) Most Class members reside continuously in Earlimart, California, as they are *seasonal*, but not generally *migrant,* farmworkers. *Id*. Of the 551 Class Members, 464 provided Class Counsel with a P.O. Box specifically designated for the receipt of mail.  (*Id*.) Of the 551 letters sent to Class Members containing the Notice of Class Settlement (in both English and Spanish), only 38 (less than 1%) were returned as undeliverable.  (*Id*.)

A short-form of the Notice was published in the local Spanish-language newspaper, "Noticiero Semanal", of Porterville, California.  (Doc. 167 at 2:18-20.)  Finally, Class Counsel sent a reminder postcard to the class members, highlighting the filing deadlines in the case.  This is adequate justification for using these methods instead of other methods.

On the merits, the settlement is fair, reasonable, and adequate.

### D. Is the Negotiated the Attorneys' Fees Award Reasonable?

Attorneys' fees provisions included in proposed class action settlement agreements are, like every other aspect of such agreements, subject to the court's scrutiny for fairness, reasonableness, and adequacy. *Staton v. Boeing Co.*, 327 F.3d 938, 963 (9th Cir. 2003). "Thus, to avoid abdicating its responsibility to review the agreement for the protection of the class, a district court must carefully assess the reasonableness of a fee amount spelled out in a class action settlement agreement." *Id.* If fees are unreasonably high, there is a "likelihood [] that the defendant obtained an economically beneficial concession with regard to the merits provisions, in the form of lower monetary payments to class members or less injunctive relief for the class than could otherwise have [been] obtained." *Id.* at 964. However, the court's task in reviewing negotiated fees is different from the court's task in fashioning fee awards from scratch. *Robbins,* 127 Cal. App. 4th at 444. The court is simply to determine whether the negotiated fee is facially fair and reasonable. *Id.* This task requires the court to review the settlement agreement as a whole, including the fee award, to ensure that it was fairly and honestly negotiated, is not collusive, and adequately protects the interests of the parties. *Id.* Plaintiffs' attorneys have a duty to limit fees to an amount that represents the value of the work done. *Id.* Therefore, although a negotiated fee may represent a reasoned business decision to settle, a negotiated fee that exceeds a reasonable fee for the attorneys' contribution may not be

**18**

approved.  *Id.*

     In calculating attorneys' fees in civil class action suits, the district court has discretion to use either the percentage method or the lodestar/multiplier method.  *Hanlon*, 150 F.3d at 1029.[9]  Under the percentage method of determining attorneys' fees, "the court simply awards the attorneys a percentage of the fund sufficient to provide class counsel with a reasonable fee."  *Id.*[10]  Class counsel here use the lodestar/multiplier method to justify their proposed settlement.  Under the lodestar/multiplier approach, the lodestar is calculated by multiplying the reasonable hours expended by a reasonable hourly rate.

> This calculation provides an objective basis on which to make an initial estimate of the value of a lawyer's services. [Attorneys] should submit evidence supporting the hours worked and rates claimed.  Where the documentation of hours is inadequate, the district court may reduce the award accordingly.

*Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983).  The district court should exclude from this initial fee calculation hours that were not "reasonably expended."  *Id.* at 434.[11]

---

[9]  When a settlement agreement creates a large fund for distribution to a class, as is the case here, courts may use either of these two options in determining what is fair and reasonable.

[10]  Under the percentage method, the Ninth Circuit has established 25% as a benchmark award for attorneys' fees in class actions.  *Hanlon*, 150 F.3d at 1029.

[11]  Also, "the product of reasonable hours times a reasonable rate does not end the inquiry.  There remain other considerations that may lead the district court to adjust the fee upward or downward..." through use of multipliers.  *Hensley, 461 U.S. at 433.*  Multipliers, which come from a percentage of the value of the class recovery fund, may be added to account for

1    The Settlement Agreement sets attorneys' fees at $795,000.00

2    plus up to $25,000.00 in fees incurred by Class Counsel during

3    the administration of the settlement disbursement, for a total

4    potential settlement of $820,000.  This amounts to approximately

5    33 percent of the total settlement of $2,520,000.000

6    ($1,700,000.00 to the Class plus $820,000 in fees and costs).

7    Although this figure appears high in relation to the Ninth

8    Circuit's standard benchmark of 25% set forth in *Hanlon*, 150 F.3d

9    at 1029, the negotiated fee represents only 85% of the lodestar

10   for work performed on this case.

11   The district court has reviewed the extensive documentation

12   provided by Class Counsel in support of the lodestar calculation

13   and finds the hours expended to be reasonable and the rates

14   charged to be appropriate.  For example, during the investigatory

15   (pre-complaint) phase of the case, a total of six staff members

16   from the firms of Miner, Barnhill & Galland ("MBG") and three

17   from the Marcos Camacho law firm ("MC") spent slightly more than

18   two hundred (200) hours on the case (averaged across the nine-

19   member team, this is approximately one week's full-time work).

20   The work was performed primarily by attorneys in the fee range of

21

22   such considerations as risk, magnitude and complexity of the
     litigation, the quality of the services provided, and the
23   beneficial result achieved.  *Arenson v. Board of Trade of
     Chicago*, 372 F. Supp. 1349, 1351 (D.C. Ill. 1974).  However, a
24   strong presumption exists that the lodestar figure represents a
     reasonable fee, and upward adjustments of the lodestar by use of
25   multipliers are proper only in rare and exceptional cases.
     *Jordan v. Multnomah County*, 815 F.2d 1258, 1262 (9th Cir. 1987).
26   Plaintiffs' attorneys in this case do not seek additional payment
     through use of multipliers.  Therefore, the fees here are based
27   solely on the product of reasonable hours worked times a
     reasonable hourly rate.
28

1  $200-300 dollars per hour, while far fewer hours were expended by

2  attorney's charging higher hourly rates.  (*See* Doc. 178 at 5.)

3      The first post-complaint phase of the litigation was also

4  performed with reasonable efficiency.  Slightly more than eight

5  hundred hours were billed by nine staff members.  This included

6  discovery scheduling, initial disclosures, fact investigation,

7  drafting a first amended complaint, and a vigorously opposed

8  motion for class certification.  Again, the bulk of the work was

9  performed by attorney's at the lower end of the billing scale

10  and/or by non-legal staff.  *Id*. at 5-6.

11     The next phase of the litigation was the most time-consuming

12  for Class counsel.  During this stage, Class Counsel responded to

13  discovery demands, deposed many witnesses, and defended the

14  depositions of the Named plaintiffs.  In addition, Class counsel

15  filed a second amended complaint, negotiated and issued the

16  court-approved class notice, and participated in a mandatory

17  settlement conference before the magistrate judge.  During this

18  phase, more than twelve hundred (1200) hours were billed by

19  lawyers and staff members from both firms, for a total lodestar

20  of $313,471.  (*Id*. at 7-8.)  Although this figure is large, the

21  district court has reviewed the billing statements for this phase

22  of the litigation and finds the hours billed to be necessary and

23  reasonable.  *See* Doc. 179, Siskind Decl., at Ex. 3; Doc. 180,

24  Lynch Decl.; Doc. 182, Willenson Decl., at Ex. 2.

25     Similarly, Class Counsel billed for the remaining phases of

26  the litigation in a reasonable manner.  During April 2005, Class

27  Counsel prepared summary judgment motions, continued to prepare

28  for trial by securing declarations from witnesses, and prepared a

**21**

1  motion for a temporary restraining order.  In accomplishing these
2  activities, Class Counsel billed slightly more than four hundred
3  hours for a total lodestar of $112,783.00.  (*Id*. at 8-9.)  From
4  May 2005 through the present, Class Counsel, participated in
5  settlement negotiations, draw up settlement documents, prepared
6  documents in support of preliminary approval, mailed class notice
7  and claims forms, fielded inquiries from class members, performed
8  payroll data analysis concerning the Class, and prepared papers
9  in support of final approval of the settlement.  During this
10 phase, Class Counsel billed slightly more than seven hundred
11 hours, for a total lodestar of $205,809.30.  Again, the billing
12 documentation in support of this figure is extensive and reveals
13 that the time spent on the case by Class Counsel was appropriate,
14 reasonable, and not duplicative.

15     Class Counsel also submits documentation of the costs
16 incurred in pursuing this litigation, which amounts to
17 $79,201.70.  It is appropriate for Class Counsel to be reimbursed
18 for such expenses.  *In re Media Vision Tech. Serv. Sec. Litig.*,
19 913 F. Supp. 1362, 1368 (N.D. Cal 1996).  Subtracting these costs
20 from the negotiated fee award of $795,000, results in
21 $715,882.30, a figure representing the total amount of fees to be
22 actually reimbursed pursuant to the settlement.  This figure
23 ($715,882.30) is 85% of the total lodestar for the litigation
24 ($842,751).[12]

25

26     [12]    As mentioned above, the settlement also provides for
   the payment of up to $25,000.00 in fees and costs that may be
27 incurred by Class Counsel in administering the settlement
   disbursement.  This potential future payment is figured into the
28 actual lodestar, as the fees/costs have yet to be occurred.

1  In addition, pursuant to the structured negotiation
2  procedure utilized by the parties, the merits settlement was
3  negotiated first, before the issue of fees was discussed. *See*
4  (Doc. 178 at 2-3.)  This process helped to safeguard the
5  interests of the Class.  *See In re Prudential Ins. Co.*, 962 F.
6  Supp. 572, 577 (D.N.J. 1997); *see also Lealao v. Beneficial Cal.*,
7  82 Cal. App. 4th 19, 52 (2000).

8  Finally, Class Counsel have agreed to defer the payment of
9  fees and costs.  The first third of the negotiated fee will be
10 paid in May 2006, the second third is due a year later, and the
11 final payment six months after that.  Moreover, the entire
12 settlement is subject to a provision that prohibits layoffs
13 resulting from the settlement's financial obligations and
14 provides Defendants the opportunity to demonstrate the necessity
15 of further deferring payments to prevent layoffs.  (Doc. 176 at
16 9.)

17 The negotiated fee is reasonable in light of the overall
18 lodestar and the procedural protections afforded to the Class
19 under the structured negotiation procedure.

20

21                        **VIII.    CONCLUSION**

22 For the reasons set forth above, the motions for approval of
23 the settlement agreement and for approval of the negotiated fee
24 award are **GRANTED.**
25 **SO ORDERED.**
26 **Dated: September 30, 2005**

27                         **/s/ OLIVER W. WANGER**
                          _____
28                              **Oliver W. Wanger**
                          **UNITED STATES DISTRICT JUDGE**